## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

WILBERT WILLIAMS                                             CIVIL ACTION
a/k/a SERENITY IZABEL WILLIAMS

VERSUS                                                       NO. 17-12993

BEVERLY KELLY, ASSISTANT                                     SECTION: "R"(1)
WARDEN, ET AL.

## <u>REPORT AND RECOMMENDATION</u>

Wilbert Williams a/k/a Serenity Izabel Williams, a state prisoner, filed this federal civil action pursuant to 42 U.S.C. § 1983 against the following defendants: Beverly Kelly, the Assistant Warden of the Rayburn Correctional Center ("Rayburn"); Chris Polk, Rayburn's Assistant Director of Nursing; Robert Tanner, Rayburn's Warden; and James M. LeBlanc, the Secretary of the Louisiana Department of Public Safety and Corrections.[1]  Plaintiff later filed an amended complaint to add two new defendants: Teresa Knight, Rayburn's Director of Nursing; and Dr. Robert Cleveland, the physician at Rayburn.[2]  In this lawsuit, plaintiff claims that the defendants have been deliberately indifferent to her need for medical treatment for gender dysphoria and have violated her right to equal protection.[3]

---

[1] Rec. Doc. 1.

[2] Rec. Doc. 8.  When docketing the amended complaint, the Clerk of Court inadvertently failed to add Dr. Cleveland as a defendant on the docket sheet and to issue summons with respect to him.  He is, however, a defendant herein.

[3] Due to the nature of plaintiff's allegations, the Court ordered that plaintiff's medical and grievance records be produced both to the Court and to her for her use in this proceeding.  Rec. Doc. 20.  Those records have been filed into this federal record.  Rec. Docs. 22 and 26.

Several motions are currently pending before the Court.  Plaintiff has filed motions for a preliminary injunction[4] and default judgment.[5]  The defendants have filed a motion to dismiss,[6] which plaintiff has opposed.[7]

## I.  Plaintiff's Allegations

In her original complaint, plaintiff made the following allegations:[8]

> Serenity Izabel Williams is an anatomical male who is suffering from Gender Dysphoria.  This is a rare psychiatric disorder in which she feels persistently uncomfortable about her anatomical sex, and who typically seek medical treatment, including sexual reassignment surgery.  Gender Dysphoria is a serious medical condition recognized by the medical community as a serious condition.
> All Defendants are all in deliberate indifference by imposing a substantial risk of serious harm to Plaintiff Williams' present and future health.
> ….
> Plaintiff avers that she's on feminizing hormone therapy.  The final step of Williams' treatment is sexual reassignment surgery, which would bring her primary and secondary sex characteristics into conformity with her female gender identity and therefore treat the severe mental anguish she experiences as a result of her gender dysphoria.
> ….
> Plaintiff avers that all of the defendants has been informed that she have been and still is suffering with a serious medical condition which is known as "Gender Dysphoria" and have been denied serious medical treatment such as sex reassignment surgery and be transfer to an all female's prison.

---

[4] Rec. Doc. 17.

[5] Rec. Doc. 19.

[6] Rec. Doc. 24.  Apparently as a result of the Clerk's error, see supra note 2, Dr. Cleveland is not listed as a movant on the motion, see Rec. Doc. 24; however, he is acknowledged therein as a defendant, see Rec. Doc. 24-1, pp. 9, 11-12, and 14.  Therefore, the Court considers Dr. Cleveland as a movant with respect to the motion.  However, even if there is some question as to the propriety of that action, the Court has the independent authority to dismiss the claim against Dr. Cleveland sua sponte pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(i) and 1915(A)(b)(1).  Those sections grant a federal court authority to screen prisoner and in forma pauperis complaints and dismiss any claim therein which "fails to state a claim upon which relief may be granted."  The standard of review applicable under those sections mirrors the standard of review under Rule 12(b)(6).  See, e.g., Preston v. Hicks, 721 Fed. App'x 342, 344 (5th Cir. 2018).  Therefore, because plaintiff fails to state a claim upon which relief may be granted for the reasons explained in this opinion, dismissal of the claims against Dr. Cleveland is appropriate regardless of whether those claims are adjudicated on the basis of the Rule 12(b)(6) motion or pursuant to the Court's screening authority.

[7] Rec. Doc. 29.  That opposition was improperly styled and docketed as a motion; however, it is simply an opposition to the defendants' motion.  Accordingly, the Clerk of Court is hereby **ORDERED** to mark that "motion" as terminated on the docket sheet.

[8] The pertinent sections of the complaint are quoted herein without any corrections to grammar; however, section headings have been omitted.

All defendants not only being aware of the facts that by denying Williams a sexual reassignment surgery; they have caused her extreme anxiety, and depression that she go to sleep crying and wake up crying knowing that she don't feel comfortable as she is in life.  She also thought of self-castrating herself.

All defendants have disregard the risk that Williams' gender dysphoria will cause her to do upon herself, by failing to take reasonable measures to abate these risks.

Plaintiff avers that defendants acted with an intent and/or purpose to discriminate again her based upon membership in a protected class.  The essence of the Equal Protection Clause is a requirement that similarly situated persons be treated alike.

In support of her Equal Protection Clause claim under 42 U.S.C. § 1983, Williams alleges that all of the defendants acted with an intent and/or purpose to discriminate against her based upon her membership in a protected class. Specifically, she alleges that defendants intentionally treat her differently than non-transgender female inmates seeking vaginoplasty due to her gender and transgender status by barring her from such treatment or, at a minimum, holding her to more onerous standard, and that Defendants discriminated against her by refusing to have her transfer to an all female's prison.

The Plaintiff further contends that none of the above provided her with a legitimate penological reasoning of denying her sex reassignment surgery.  There are no institution policy nor Department or State's policies and regulations barring the plaintiff vaginoplasty surgery.  If there are statutes and regulations that bar her from getting sex reassignment surgery; then it is facially discriminatory because it explicitly distinguishes between treatment for transsexual woman that is designated as presumptively "not medically necessary" (i.e. castration and vaginoplasty for treatment of gender dysphoria) and the same treatments for non-transgender woman (i.e. vaginoplasty for treatment of cystocele or rectocele), which are explicitly exempted from this bar.

….

Here, Williams has alleged that each Defendants discriminated against her on the basis of her transgender status.  She alleges that, in considering her need for medically necessary surgery, and vaginoplasty in particular, Defendants treated her differently from a similarly situated non-transgender woman in need of medically necessary surgery.  They articulate no important governmental interest, much less describe how their gender classification – which makes it more difficult for a transgender person to receive gender reassignment surgery than it is for a cisgender woman – is substantially related to that interest.[9]

In her amended complaint, plaintiff added the following additional pertinent allegations:

---

[9] Rec. Doc. 1, pp. 4-8.

1.      Plaintiff has been living as a female since adolescence in the early 2000s;

2.      She has been in custody since on or about October 16, 2015;

3.      In 2016, a prison psychiatrist, Dr. Matthew Gamble, diagnosed her as suffering from gender dysphoria;

4.      She began feminizing hormone therapy on June 29, 2017;

5.      She is classified in the prison system as transgender "based on her sexual preference and her mental health status";

6.      She requested sex reassignment surgery on "numerous occasions" with no success;

7.      She filed an administrative grievance which was denied at the final step by defendant LeBlanc;

8.      Defendants are aware that she has attempted suicide on "numerous occasions since childhood," and their refusal to provide sex reassignment surgery poses an unreasonable risk to her health and life;

9.      Sex reassignment surgery would allow plaintiff "to reduce the high dosages of hormones she receives, which put her at increased risk for heart and vascular condition and certain types of cancer";

10.     If she goes untreated or if treatment is discontinued, there is a severe risk that she "will experience suicidal tendencies, the impulse to engage in self-castration, or self-harm, clinically significant depression, anxiety, and mental impairment."[10]

Plaintiff attached to her amended complaint copies of the responses to her administrative grievance.  At the first step, Warden Tanner denied relief, stating:

---

[10] Rec. Doc. 8, pp. 3-10.

4

Your complaint seeking sex reassignment surgery and an eventual transfer to a female prison has been reviewed.

According to your medical record, you were properly evaluated by the medical staff at his [sic] facility and subsequently prescribed hormone replacement therapy. You have been referred to the management team for continued review of your status. Documentation in your medical record indicates that you are non-compliant with taking your treatment regime as prescribed. As a result of your non-compliance, you are not eligible for consideration for gender affirming surgery. You are encouraged to comply with your treatment plan and continue to meet with the mental health staff as needed.

Your request for a remedy is denied.[11]

At the second and final step of the administrative remedy procedure, Secretary LeBlanc's designee then likewise denied relief, stating:

It has been determined that your complaint is without merit. The medical staff has addressed your concerns in an appropriate manner and in accordance with DOC Health Care Policy. Medical opinion is controlling. The care you have received as well as the care you will continue to receive from the Medical staff is determined adequate for your health care concerns. As such, this office has accepted staff's position in this matter and concurs with the response provided at the First Level. Therefore, administrative intervention is not forthcoming.

Your request for relief is denied.[12]

## II. Motion for Preliminary Injunction

Plaintiff has filed a motion for a preliminary injunction.[13]  Under the law of this Circuit, a plaintiff must make a clear showing that her case satisfies the following four criteria before she can receive a preliminary injunction:  (1) a substantial likelihood exists that she will succeed on the merits of her claim; (2) a substantial threat of irreparable harm exists if the injunction is not granted; (3) the threatened injury outweighs any harm to the defendants if the injunction is granted; and (4) the injunction will not undermine the public interest.  See Valley v. Rapides Parish School

---

[11] Rec. Doc. 8-5, p. 4.  The Court notes that plaintiff vigorously denies the allegation that she was non-compliant with her treatment orders.  See Rec. Doc. 29-1, p. 5; Rec. Doc. 29-3, pp. 2-3.  However, that factual dispute is irrelevant to the Court's analysis, in that her medical claim fails in any event for the reasons explained herein.
[12] Id. at p. 5.
[13] Rec. Doc. 17.

Board, 118 F.3d 1047, 1051 (5th Cir. 1997); see also Ingebresten v. Jackson Public School District, 88 F.3d 274, 278 (5th Cir. 1996); Doe v. Duncanville Independent School District, 994 F.2d 160, 163 (5th Cir. 1993); Holland American Insurance Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985).  She must satisfy all four factors; a failure to satisfy even one of the four factors requires a denial of the preliminary injunction.  See Mississippi Power & Light v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

For the reasons explained *infra*, plaintiff's claims should be dismissed.  Therefore, she cannot show that there is a substantial likelihood that she will succeed on the merits of her claims, and, accordingly, her motion for a preliminary injunction should be denied.

### III.  Motion for Default Judgment

Plaintiff has also filed motion for the entry of a default judgment.[14]  However, for the following reasons, it is clear that the motion should be denied because the defendants were never technically in default and, in any event, a default judgment would be inappropriate.

First, because plaintiff is an inmate, her civil action is subject to the Prison Litigation Reform Act of 1995 ("PLRA").  "[U]nlike in the typical civil case, *defendants do not have to respond to a complaint covered by the PLRA until required to do so by the court*, and waiving the right to reply does not constitute an admission of the allegations in the complaint."  Jones v. Bock, 549 U.S. 199, 213-14 (2007) (emphasis added); 42 U.S.C. § 1997e(g)(1).   In the instant case, the Court never entered an order directing the defendants to respond to the complaint, and, therefore, they were not in default.  See, e.g., McCurdy v. Johnson, No. 2:08-cv-01767, 2012 WL 3135906, at *1-2 (D. Nev. Aug. 1, 2012).

---

[14] Rec. Doc. 19.

Second, the motion for default judgment is premature because a default has not been entered pursuant to Fed. R. Civ. P. 55(a).  See Structural Concrete Products, LLC v. Clarendon America Insurance Co., 244 F.R.D. 317, 328 (E.D. Va. 2007);  Griffin v. Foti, Civ. Action No. 03-1274, 2003 WL 22836493, at *1 (E.D. La. Nov. 24, 2003); Great Atlantic & Pacific Tea Co. v. Heath, Civ. Action No. 95-509, 1995 WL 258317, at *1 (E.D. La. Apr. 27, 1995).

Third, even if the defendants had been in default, and even if a default had been entered, entry of a default judgment still would not be warranted.  Entry of a default judgment is matter of discretion, and "a party is not entitled to a default judgment as a matter of right, even where the defendant is technically in default.  In fact, default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations."  Lewis v. Lynn, 236 F.3d 766, 767 (5th Cir. 2001) (citations, quotation marks, and brackets omitted); accord Griffin, 2003 WL 22836493, at *1.  This is not such a situation in light of the fact that plaintiff's complaint should be dismissed for the reasons set forth in this opinion.

## IV.  Motion to Dismiss

### A.  Rule 12(b)(1)

In their motion, the defendants first argue that any claims against them for monetary damages in their official capacities should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.[15]  That rule governs challenges to a court's subject-matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  Home Builders Association of

---

[15] See Rec. Doc. 24-1, pp. 3-5.

Mississippi, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998) (quotation marks omitted).

If plaintiff had sought monetary damages in this action, then the defendants would have a valid point. All defendants are officials with the Louisiana Department of Public Safety and Corrections, and it is clear that "[a] suit against a state official in his official capacity for monetary damages is treated as a suit against the state and is therefore barred by the Eleventh Amendment." Chaney v. Louisiana Work Force Commission, 560 Fed. App'x 417, 418 (5th Cir. 2014); accord Watson-Buisson v. Louque, Civ. Action No. 12-1871, 2013 WL 5236611, at *1 (E.D. La. Sept. 13, 2013).[16]

However, in her opposition, plaintiff correctly notes that defendants' argument on this point is misplaced, because she has sought *only* prospective injunctive relief and made no claim for monetary damages.[17] Where, as here, a plaintiff has sued state officials in their official capacities for prospective injunctive relief based on allegations that those officials have acted in an unconstitutional manner, a federal court has jurisdiction over those claims. See, e.g., Darlak v. Bobear, 814 F.2d 1055, 1061 (5th Cir. 1987) ("[T]hat part of this case is a suit seeking prospective

---

[16] As the United States Fifth Circuit Court of Appeals has explained:

> The Eleventh Amendment bars a state's citizens from filing suit against the state or its agencies in federal courts. ... By statute, Louisiana has refused any ... waiver of its Eleventh Amendment sovereign immunity regarding suits in federal court. See La.Rev.Stat.Ann. § 13:5106(A).
> Furthermore, Congress may only abrogate a state's Eleventh Amendment immunity by unequivocally expressing its intent to do so and by acting pursuant to a valid exercise of power. We note that in enacting § 1983, Congress did not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States.

Cozzo v. Tangipahoa Parish Council-President Government, 279 F.3d 273, 280-81 (5th Cir. 2002) (citations and quotation marks omitted); Champagne v. Jefferson Parish Sheriff's Office, 188 F.3d 312, 313-14 (5th Cir. 1999).
[17] Rec. Doc. 29-1, pp. 3-4; see also Rec. Doc. 1, p. 9; Rec. Doc. 8, p. 21.

injunctive relief against state officials who are alleged to have acted unconstitutionally, and therefore the _Ex parte_ Young exception to the eleventh amendment applies and both the district court and this court have jurisdiction to reach the [constitutional] issue presented." (footnote omitted)).  Therefore, the defendants are not entitled to a dismissal pursuant to Rule 12(b)(1).

## B.  Rule 12(b)(6)

The defendants next argue that plaintiff's claims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  That rule allows a defendant to move for dismissal when a plaintiff fails to state a claim upon which relief can be granted.  In ruling on a Rule 12(b)(6) motion, "[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff."  _In re_ Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (quotation marks omitted).  However, "[t]o survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. (citation, footnote, and quotation marks omitted).  On that point, the United States Supreme Court has explained:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations and quotation marks omitted).

## 1.  Preliminary Matters

Before turning to plaintiff's specific claims, the Court must address two preliminary issues raised by the defendants.

### a.  Qualified Immunity

The defendants argue that they are entitled to qualified immunity.  However, because plaintiff seeks only injunctive relief, that defense is simply inapplicable in this case.  See, e.g., Williams v. Ballard, 466 F.3d 330, 334 n.7 (5th Cir. 2006) ("Qualified immunity does not protect officials from injunctive relief.").

### b.  Improper Defendants

The defendants next argue that Kelly, Turner, and LeBlanc are improper defendants in this lawsuit because they hold supervisory administrative positions and were not personally involved in the making of the medical decisions challenged herein.  That is correct.

A supervisory defendant cannot be held liable pursuant to § 1983 based merely on a theory of strict liability[18] or vicarious liability.[19]  Rather, for a supervisory official to be held liable for a federal civil rights violation under § 1983, he or she must have been *personally involved* in the violation.  See Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").  Therefore, supervisory officials who are not personally involved in the provision of an inmate's medical care cannot be held liable with

---

[18] Harris v. Greer, 750 F.2d 617, 618 (7th Cir. 1984) ("[T]here is no concept of supervisor strict liability under section 1983."); see also Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996); Evans v. Gusman, Civ. Action No. 08-703, 2008 WL 2223281, at *2 (E.D. La. May 23, 2008); Castillo v. Blanco, Civ. Action No. 07-215, 2007 WL 2264285, at *5 (E.D. La. Aug. 1, 2007).

[19] Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987) ("Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability."); see also Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or *respondeat superior* liability."); Evans, 2008 WL 2223281, at *2.

respect to claims challenging medical decisions.  See, e.g., Gillam v. Gusman, Civ. Action No. 15-1737, 2015 WL 7289849, at *3 (E.D. La. Oct. 26, 2015), adopted, 2015 WL 7302238 (E.D. La. Nov. 18, 2015).[20]

Although not raised by the defendants, the Court also notes that there appears to be an additional problem with respect to plaintiff's claims against the three defendants herein who were allegedly personally involved in providing her medical care at Rayburn:  Knight, Rayburn's Director of Nursing; Polk, Rayburn's Assistant Director of Nursing; and Dr. Cleveland.  Even if the Court assumes that those defendants were proper with respect to plaintiff's claims at the time this lawsuit was filed,[21] it appears that they are no longer proper defendants.  Since filing this lawsuit, plaintiff has been transferred from Rayburn to a different facility, the Elayn Hunt Correctional Center.[22]  In light of that transfer, it appears that plaintiff's claims for injunctive relief, the only form of relief she is seeking herein, would be moot with respect to those defendants.  See Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001); see also Million v. Grounds, 690 Fed. App'x 163, 164 (5th Cir. 2017); Bray v. Young, 261 Fed. App'x 765, 766 (5th Cir. 2008); Vincent v. Stevenson, No. 96-30452, 1997 WL 33444 (5th Cir. Jan. 13, 1997).  Nevertheless, because this

---

[20] Further, although Tanner and LeBlanc were involved in the denial of plaintiff's administrative grievance, that fact likewise does not subject them to liability.  Inmates have no constitutional right to an adequate and effective grievance procedure or to have their complaints investigated and resolved to their satisfaction.  Bonneville v. Basse, 536 Fed. App'x 502, 503 (5th Cir. 2013); Propes v. Mays, 169 Fed. App'x 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); Davis v. St. Charles Parish Correctional Center, Civ. Action No. 10-98, 2010 WL 890980, at *5 (E.D. La. Mar. 8, 2010); Carter v. Strain, Civ. Action No. 09-15, 2009 WL 3231826, at *3 (E.D. La. Oct. 1, 2009); Tyson v. Tanner, Civ. Action No. 08-4599, 2009 WL 2883056, at *5 (E.D. La. Aug. 25, 2009); Mahogany v. Miller, Civ. Action No. 06-1870, 2006 WL 4041973, at *1 (E.D. La. Aug. 3, 2006), appeal dismissed, 252 Fed. App'x 593 (5th Cir. 2007).  Therefore, the mere fact that an official denied a plaintiff's grievance does not render him liable for the purported underlying violation on which the grievance is based.  See, e.g., Harold v. Goff, Civ. Action No. 16-13041, 2016 WL 8137642, at *5 (E.D. La. Dec. 1, 2016), adopted, 2017 WL 413082 (E.D. La. Jan. 30, 2017).
[21] This assumption appears questionable with respect to nurses Knight and Polk.  Plaintiff's claims stem from the fact that she was denied sex reassignment surgery.  It seems unlikely that the prison's nurses, as opposed to the prison physician, were the ultimate decisionmakers as to whether surgery would be provided.
[22] Rec. Doc. 21.

argument was not raised by the defendants, and because plaintiff could amend her complaint to add new defendants who are presumably now making similar decisions with respect to her medical care at her new facility, the Court, out of an abundance of caution, notes that plaintiff's claims fail on the merits for the following reasons.

## 2.  Plaintiff's Claims

In this lawsuit, plaintiff asserts two related but nevertheless distinct claims:  a medical claim under the Eighth Amendment and an Equal Protection claim under the Fourteenth Amendment.

## a.  Medical Claim

Plaintiff's primary claim is that her right to medical care has been violated.  Obviously, all inmates, regardless of whether they are pretrial detainees or convicted prisoners, have a right to medical care in jail.  However, that right is a limited one, and an inmate's constitutional right to medical care is violated only if her "serious medical needs" are met with "deliberate indifference" on the part of penal authorities.  See Thompson v. Upshur County, Texas, 245 F.3d 447, 457 (5th Cir. 2001); Harris v. Hegmann, 198 F.3d 153, 159 (5th Cir. 1999).

In this case, plaintiff alleges that she has been diagnosed with gender dysphoria, an allegation which the defendants do not dispute.  In recent years, the medical community's view of that condition has evolved.  As one author recently observed:

> An individual is transgender if his or her gender identity differs from the sex he or she was assigned at birth.  Once known as "Gender Identity Disorder" (GID), the American Psychological Association (APA) renamed the condition "gender dysphoria" in its Diagnostic and Statistical Manual of Mental Disorders (DSM-5) in 2012.  The APA no longer conceptualizes gender dysphoria as a mental illness, but does consider it a medical condition that can greatly affect a patient's mental and physical health.  The APA defines gender dysphoria as a "marked difference between an individual's expressed or experienced gender and the gender

> that others would assign him or her that continues for at least six months." It can cause "clinically significant distress or impairment in social, occupational, or other important areas of functioning" and can be manifested in a variety of ways, including the "strong desire to be treated as the other gender and the strong desire to rid oneself of one's sexual characteristics."

Morgan S. Mason, Note and Comment, Breaking the Binary: How Shifts in Eighth Amendment Jurisprudence Can Help Ensure Safe Housing and Proper Medical Care for Inmates with Gender Dysphoria, 71 Vand. L. Rev. En Banc 157, 160 (2018) (footnotes omitted).

Courts, however, have struggled with the issue of whether gender dysphoria constitutes a "serious medical need" for the purpose of Eighth Amendment claims. The Supreme Court has not spoken on that issue. Id. at 183 ("While medical consensus on gender dysphoria has grown, the Supreme Court has never directly found it to be a serious medical need for Eighth Amendment purposes."); see also Laura R. Givens, Note, Why the Courts Should Consider Gender Identity Disorder a Per Se Serious Medical Need for Eighth Amendment Purposes, 16 J. Gender Race & Just. 579, 587 (2013) ("The Supreme Court has never addressed the question of whether GID constitutes a serious medical need."). Meanwhile, the United States Fifth Circuit Court of Appeals Court of Appeals has side-stepped the issue. Praylor v. Texas Department of Criminal Justice, 430 F.3d 1208, 1206 (5th Cir. 2005) (assuming, without deciding, that transsexualism presented a serious medical need).

In light of that absence of controlling precedent, the Court must revert to the general standards for resolving the issue. In this circuit, "[a] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." Gobert v. Caldwell, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

Within the medical community, there appears to be little dispute that gender dysphoria normally requires medical treatment and that failure to treat the condition can pose significant risks:

> The World Professional Association for Transgender Health (WPATH) is the leading global authority on medical care for persons with gender dysphoria – it promulgates standards that are embraced by the APA and considered scientific consensus by psychologists and gender specialists.  The WPATH also considers gender dysphoria to be a serious medical condition that carries a high risk of suicide and attempted self-surgery if left untreated.  Indeed, case law on prisoners with untreated gender dysphoria is rife with examples of inmates committing self-harm, often by mutilating or attempting to remove their own genitals.  Receiving gender-confirming therapy is vital for many transgender individuals.  Gender dysphoria patients have a 20% to 30% suicide rate if left untreated, compared to only a 1% to 2% rate if receiving proper medical care.  The fact that treatment makes persons with gender dysphoria 10 to 30 times less likely to commit suicide puts its importance into sharp relief.

Mason, *supra*, at 160-61 (footnotes omitted); see also Fields v. Smith, 653 F.3d 550, 553 (7th Cir. 2011) ("A person with GID often experiences severe anxiety, depression, and other psychological disorders.  Those with GID may attempt to commit suicide or to mutilate their own genitals.").

In light of such considerations, as well as persuasive authority from other circuits, the undersigned has no hesitation in concluding that gender dysphoria can, at least in some circumstances, constitute a "serious medical need."  See Tammi S. Etheridge, Safety v. Surgery: Sex Reassignment Surgery and the Housing of Transgender Inmates, 15 Geo. J. Gender & L. 585, 592 (2014) ("Seven circuits of the U.S. Courts of Appeals have concluded that *severe* GID or transsexualism constitutes a 'serious medical need' for purposes of the Eighth Amendment.  No circuit court has held otherwise." (emphasis added; footnotes omitted)); see also Susan S. Bendlin, Gender Dysphoria in the Jailhouse:  A Constitutional Right to Hormone Therapy?, 61 Clev. St. L. Rev. 957, 967 (2013) ("To the extent that the circuits differ, it is not over whether Gender

Dysphoria constitutes a serious medical need, but over whether treatment is warranted in a specific case, and if so, what type of treatment should be provided.  The objective prong of the test under § 1983 – 'serious medical need' – can typically be satisfied by the inmate.").[23]  Plaintiff's allegations, accepted as true for the purposes of the motion to dismiss, suffice to allege the existence of a "serious medical need" in this case.

However, as noted, an Eighth Amendment medical claim also has a second component: "deliberate indifference."  That is the component on which most such claims involving gender dysphoria fail.  See Tara Dunnavant, Bye-Bye Binary:  Transgender Prisoners and the Regulation of Gender in the Law, 9 Fed. Cts. L. Rev. 15, 26 (2016) ("The difficulty of meeting the Eighth Amendment deliberate indifference standard … means that many trans prisoners are unsuccessful with such claims.").  For the following reasons, the Court finds that plaintiff's allegations are insufficient to state a claim of deliberate indifference in the instant case.

The United States Fifth Circuit Court of Appeals has explained:

> Deliberate indifference is an extremely high standard to meet.  It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.  Rather, the plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  Furthermore, the decision whether to provide additional treatment is a classic example of a matter for medical judgment.  And, the failure to alleviate a significant risk that the official should have perceived, but did not is insufficient to show deliberate indifference.

Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001) (citations, quotation marks, and brackets omitted).  "Deliberate indifference encompasses only unnecessary

---

[23] That, of course, is not to say that gender dysphoria would necessarily constitute a "serious medical need" in *every* case, in that the severity of the condition can vary.  See Fields, 653 F.3d at 553 ("The feelings of dysphoria can vary in intensity.  Some patients are able to manage the discomfort, while others become unable to function without taking steps to correct the disorder.").

and wanton infliction of pain repugnant to the conscience of mankind." McCormick v. Stalder, 105 F.3d 1059, 1061 (5th Cir. 1997); see also Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

Based on plaintiff's allegations, it is clear that her gender dysphoria is not being ignored by prison officials; on the contrary, she expressly acknowledges that she has been on feminizing hormone therapy since June 29, 2017.[24]

Although plaintiff would prefer a *different* form of treatment, i.e. sex reassignment surgery, she does not allege that *any* medical professional has *ever* concluded either (1) that hormone therapy is an *improper form of treatment for her* or (2) that sex reassignment surgery is *medically necessary for her*.  That is critical, because although such surgery can be necessary and appropriate *in some circumstances*, a range of medically appropriate treatment options, specifically including hormone therapy, exists for gender dysphoria.  As the United States Seventh Circuit Court of Appeals observed:

> The accepted standards of care dictate a gradual approach to treatment beginning with psychotherapy and real life experience living as the opposite gender.  For some number of patients, this treatment will be effective in controlling feelings of dysphoria.  When the condition is more severe, a doctor can prescribe hormones, which have the effect of relieving the psychological distress.  Hormones also have physical effects on the body.  For example, males may experience breast development, relocation of body fat, and softening of the skin.  In the most severe cases, sexual reassignment surgery may be appropriate.  *But often the use of hormones will be sufficient to control the disorder.*

Fields, 653 F.3d at 553-54 (emphasis added).  Similarly, a federal district court noted:

> The Harry Benjamin Standards of Care (the "Standards of Care") are protocols used by qualified professionals in the United States to treat individuals suffering from gender identity disorders.  According to the Standards of Care, psychotherapy with a qualified therapist is sufficient treatment for some

---

[24] Rec. Doc. 8, pp. 3 and 15.

individuals.  *In other cases psychotherapy and the administration of female hormones provide adequate relief.*  There are, however, some cases in which sex reassignment surgery is medically necessary and appropriate.

Kosilek v. Maloney, 221 F. Supp. 2d 156, 158-19 (D. Mass. 2002) (emphasis added).

Legal scholarship echoes that view.  One author observed:

For those who receive a formal diagnosis, the recommended treatment varies according to the individual; what is adequate to relieve the anxiety associated with gender dysphoria for one individual may not be for another.  One common misnomer about transgender people is that surgery is the only or most desirable option, but many trans men and women do not need to alter their bodies physically.  For some individuals, gender confirmation surgery is crucial for their well-being, but changes in gender expression and role (hair removal, name change, voice therapy, etc.), psychotherapy for exploring one's gender role and processing the stigma associated with gender dysphoria, and building social support networks are also valid treatment option.

Dunnavant, *supra*, at 26 (footnotes omitted).  Likewise, another author noted:

Appropriate treatment for gender dysphoria differs based on the patient; the WPATH recommends individualized treatment plans that typically include counseling, hormone treatment, living in accordance with one's gender identity, or some combination thereof.  Since effective treatment varies greatly by individual, transgender healthcare demands specific diagnoses from trained medical experts.  Gender identity specialists recommend gender-confirmation surgery (also known as sexual reassignment surgery, or SRS) when hormone therapies and other methods do not adequately relieve the patient's distress.

Mason, *supra*, at 161 (footnotes omitted).

At its crux, whether plaintiff requires sex reassignment surgery in lieu of or in addition to the hormone treatments is inherently a *medical* issue which requires the exercise of *medical* judgment.  See Domino v. Texas Department of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001) ("[T]he decision whether to provide additional treatment is a classic example of a matter for medical judgment." (quotation marks omitted)).  Generally, such matters of professional medical judgment are better left to the expertise of medical personnel rather than to the legal expertise of

judges.  Federal courts are therefore reluctant to second-guess such medical decisions in federal civil rights actions.  Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."); Castro v. Louisiana, Civ. Action No. 08-4248, 2008 WL 5169401, at *4 (E.D. La. Dec. 8, 2008) ("[M]edical judgments are not to be lightly second-guessed in a federal civil rights action.").

There is simply no basis whatsoever to engage in such second-guessing in the instant case. Indeed, in a remarkably similar case, the United States First Circuit Court of Appeals expressly denied a prisoner's claim that her constitutional rights were violated by the choice to treat her gender dysphoria by lesser means than sex reassignment surgery, explaining:

> The law is clear that where two alternative courses of medical treatment exist, and both alleviate negative effects within the boundaries of modern medicine, it is not the place of our court to "second guess medical judgments" or to require that the DOC adopt the more compassionate of two adequate options.
> That the DOC has chosen one of two alternatives – both of which are reasonably commensurate with the medical standards of prudent professionals, and both of which provide [the prisoner] with a significant measure of relief – is a decision that does not violate the Eighth Amendment.

Kosilek v. Spencer, 774 F.3d 63, 90 (1st Cir. 2014) (citations omitted).

Moreover, the mere fact that plaintiff *disagrees* with the conclusion that the hormone therapy is appropriate in her case is not sufficient to make her claim actionable.  Absent exceptional circumstances, a prisoner's mere disagreement with her medical treatment simply does not constitute deliberate indifference.  Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006); Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is

adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997) ("Disagreement with medical treatment does not state a claim for Eighth Amendment indifference to medical needs."); see also Brauner v. Coody, 793 F.3d 493, 500 (5th Cir. 2015) (a prison doctor's "refusal to accommodate [a prisoner's] requests in the manner he desired" is not deliberate indifference).

It must also be noted that it is irrelevant that a prisoner's medical care may not be "the best money could buy." Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992); accord Gobert, 463 F.3d at 349 ("[D]eliberate indifference exists wholly independent of an optimal standard of care."); McMahon v. Beard, 583 F.2d 172, 174 (5th Cir. 1978).

Lastly, it is clear that the federal constitution does not require even that an inmate's medical care be free from negligence or medical malpractice. Hall v. Thomas, 190 F.3d 693, 697-98 (5th Cir. 1999); see also Kelly v. Gusman, Civ. Action No. 07-611, 2007 WL 2007992, at *4 (E.D. La. July 5, 2007); Cerna v. Texas Tech Medical Staff, No. 2:03-CV-0322, 2004 WL 42602, at *2 (N.D. Tex. Jan. 7, 2004). Rather, claims of negligence or medical malpractice present issues of state law for state courts, not federal constitutional issues for a federal court. See Estelle v. Gamble, 429 U.S. 97, 107 (1976); Coleman v. Terrebonne Parish Criminal Justice Complex, Civ. Action No. 13-4325, 2013 WL 6004051, at *4 (E.D. La. Nov. 13, 2013).

In summary, the determinative issue before the Court with respect to plaintiff's medical claim is not whether she is satisfied with her care or whether her medical treatment is subpar in some respect; rather, it is only whether her serious medical need is being met with deliberate indifference. Her allegations are insufficient to state such a claim in this case, and, therefore, her claim that she was denied adequate medical care should be dismissed.

### b.  Equal Protection Claim

As noted, plaintiff also asserts an equal protection claim under the Fourteenth Amendment. In their motion, the defendants contend that because this claim is ill-defined in plaintiff's pleadings, they are at somewhat of a loss as to how to address it.  The defendants make a valid point.

However, it appears that plaintiff's claim is that because cisgender[25] female inmates are provided vaginal surgeries in some circumstances, the refusal to provide her, a transgender female, sex reassignment surgery violates the Equal Protection Clause.  If that is indeed her claim, it has no merit.

Even those who share plaintiff's view that this purported disparity of treatment *should* constitute a violation of the Equal Protection Clause concede that the argument has not been successful in the federal courts.  As one author observed:

> It would seem that prison policies that disparately harm transgender people by failing to provide medical care to transgender prisoners when cisgender prisoners have access … would properly be struck down under equal protection, particularly if heightened scrutiny applies, but transgender prisoners have had little success with such claims against prisons.

Dunnavant, *supra*, at 33-34 (footnotes omitted).

The problem with such claim is that it simply does not fit within an equal protection analysis.  As the United States Fifth Circuit Court of Appeals has observed:

> The Equal Protection Clause of the Fourteenth Amendment is essentially a direction that all persons *similarly situated* should be treated alike.  Its basics are rote:  *equal protection does not require that all persons be dealt with identically,*

---

[25] "Cisgender individuals are those whose gender identity corresponds to their sex at birth. See Cisgender, Oxford English Dictionary (3d ed. 2015)." Campbell v. Kallas, No. 16-cv-261, 2018 WL 2089351, at *1 n.1 (W.D. Wis. May 4, 2018).

> *but it does require that a distinction made have some relevance to the purpose for which the classification is made.*

Wood v. Collier, 836 F.3d 534, 538-39 (5th Cir. 2016) (emphasis added; footnotes, quotation marks, and brackets omitted).

Here, plaintiff is not alleging that she is being treated differently than other prisoners suffering from gender dysphoria. Her complaint is that she, a transgender inmate, is being denied sex reassignment surgery, while cisgender female inmates suffering from cystocele (a prolapsed or dropped bladder) or rectocele (a herniation of the front wall of the rectum into the back wall of the vagina) are provided with surgical treatments for their conditions. However, because plaintiff is not "similarly situated" to the prisoners she uses as a basis of comparison, her equal protection claim necessarily fails. As one federal district judge recently explained in rejecting a similar claim:

> [Plaintiff] pursues two theories of discrimination. First, she contends that she is a biological male, that she is otherwise similarly situated to biological females, and that the DOC policy denies medically necessary vaginoplasty to biological males, but not biological females. Second, she contends that she is a transgender inmate, that she is otherwise similarly situated to cisgender inmates, and that the DOC policy denies medically necessary vaginoplasty to transgender inmates, but not cisgender inmates.
> ….
> "[The Supreme] Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances." Michael M. v. Superior Court, 450 U.S. 464, 469 (1981). This is one such circumstance. … The biological female already has a vagina; the biological male doesn't. The government has an interest in ensuring that inmates receive appropriate, effective medical treatment. *Employing different decision-making policies for different types of medical procedures does not violate the Equal Protection Clause.*

Campbell v. Kallas, No. 16-cv-261, 2018 WL 2089351, at *10 (W.D. Wis. May 4, 2018) (emphasis added). Cf. Cunningham v. Beavers, 858 F.2d 269, 272 (5th Cir. 1988) ("The Equal Protection

Clause directs that all persons similarly circumstanced shall be treated alike; it does not require classes of people different in fact or opinion to be treated in law as though they were the same.").

## RECOMMENDATION

It is therefore **RECOMMENDED** that plaintiff's motion for a preliminary injunction, Rec. Doc. 17, and her motion for default judgment, Rec. Doc. 19, be **DENIED**.

It is **FURTHER RECOMMENDED** that defendants' motion to dismiss, Rec. Doc. 24, be **GRANTED**.

It is **FURTHER ORDERED** that plaintiff's claims be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-seventh day of August, 2018.


**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**